FILED

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

2014 JUL 15  A 11: 46

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NEUSTAR, INC., LISA A. HOOK, STEVEN J. EDWARDS, and PAUL S. LALLJIE<br><br>Defendants. | Civ. A. No. 1:14CV-885 (JCC/TRJ)<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u><br><br>**ECF CASE** |

Plaintiff Oklahoma Firefighters Pension and Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.   Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by NeuStar, Inc. ("NeuStar" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning NeuStar; and (d) other public information regarding the Company.

## INTRODUCTION

1.     This is a federal securities class action brought on behalf of purchasers of NeuStar's publicly traded common stock between April 19, 2013 to June 6, 2014, inclusive (the "Class Period").   The claims asserted herein are alleged against NeuStar and three of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      NeuStar provides communications clearinghouse services to telecommunication companies and internet service providers. Since 1997, the Company has served as the Local Number Portability Administrator ("LNPA") for the U.S. In its capacity as LNPA, the Company has been the sole manager of the world's largest number portability registry, which enables approximately 4,800 telecom carriers to route billions of phone calls and text messages daily, and allows customers to transfer phone numbers among different carriers ("NPAC Services"). NeuStar serves as LNPA through a series of contracts with North American Portability Management LLC ("NAPM"), an industry group that represents all telecommunications service providers in the U.S. In 2013, NeuStar generated $446.6 million – nearly half of its annual revenue – from its NAPM contracts.

3.      NeuStar's virtual monopoly on NPAC Services has allowed the Company to generate over $3 billion in revenue over its decade-long tenure as the LNPA, as well as extremely high profit margins of over 65% on the NAPM contracts. But at least as early as 2005, telecommunications companies began complaining about the costs of the NAPM contracts—costs which they ultimately must bear themselves. And in September 2006, a NeuStar competitor named Telcordia Technologies, Inc. ("Telcordia"), filed a petition with the Federal Communications Commission ("FCC") to force NAPM to conduct a new bidding process for NPAC services.

4.      In February 2013 NAPM issued a request for proposals ("RFP") and put the NAPM contracts, due to expire in June 2015, up for public bid. The terms of the RFP required applicants to submit their bids by April 5, 2013. On April 5, NeuStar announced that it timely

submitted its proposal in response to the RFP. Then, on April 17, 2013, NAPM unexpectedly announced that it would extend the RFP submission deadline to April 22, ostensibly to allow NeuStar competitors to submit their bids.

5.     Throughout the Class Period, the Company repeatedly misrepresented that it was in a strong position to win the new NAPM contracts, and that the Company's track record as LNPA set it apart from its competitors. Indeed, on April 18, 2013, after the markets closed, NeuStar issued a press release stating that the Company was confident in the strength of its proposal, and downplaying the new RFP deadline and the additional proposals that could now be submitted. Further, on August 15, 2013, NAPM announced the commencement of a new best-and-final offer process for offerors to submit updated responses to the RFP. NeuStar continued to publicly tout the Company's confidence in its position to be awarded the contract.

6.     These statements were false. In truth, throughout the Class Period, the Company knew but misrepresented or concealed from investors that its bid was not competitive, that changes to the RFP process prejudiced NeuStar in favor of its competitors, and that the Company recognized a need to modify its bid but was not permitted to do so. Indeed, the Company also knew but concealed that even if it did win the NAPM contracts, it would be retained pursuant to terms far less favorable than under the current NAPM contracts, which would adversely impact NeuStar's business and earnings.

7.     The Company was so concerned that its bid under the RFP was not competitive that, in September 2013, NeuStar secretly submitted a revised proposal in connection with NAPM's best-and-final offer process, while publicly reassuring investors that its opening bid was competitive. Still concerned after that submission about the strength of its revised bid, in October 2013 and again in November 2013, the Company secretly requested that NAPM permit

it to again revise its proposal. Together with the October request, the Company also submitted a proposed revised proposal. At the same time that NeuStar was secretly begging the NAPM for permission to submit these revised bids, the Company continued to falsely assure investors that it remained confident in its ability to win the NAPM contracts based on its opening bid.

8.      It was not until January 29, 2014, when NeuStar announced results for its fourth quarter of 2013, that investors began to learn the truth. On that day, after the close of trading, NeuStar revealed for the first time that it had in fact submitted a new bid in September 2013 and subsequently, in October and November 2013, had petitioned NAPM to re-open the entire bidding process so that NeuStar could again revise its proposal. On this news, the price of the Company's stock declined from $43.75 per share to $35.11 per share, or almost 20%.

9.      Then, on June 6, 2014, after the close of trading, the inadvertent disclosure of a confidential email to the FCC revealed that NeuStar was not expected to win the NAPM contracts. A copy of that email, which was sent to the FCC by an employee of the North American Numbering Council ("NANC"), which is responsible for making a recommendation to the FCC regarding who should win the NAPM contracts, was inadvertently posted to the FCC docket and made public. The email indicated that NANC recommended that the FCC award the contract to Telcordia. The disclosure of the NANC email to the FCC caused the price of Neustar stock to drop from $26.67 per share to $24.43 per share, or over 8%.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). NeuStar maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.     Plaintiff Oklahoma Firefighters Pension and Retirement System is a public pension fund established in 1981 that manages and administers retirement benefits to firefighters in the State of Oklahoma. As of June 30, 2013 Plaintiff held over $2 billion in total assets for the benefit of more than 23,000 members. Plaintiff purchased shares of NeuStar stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

13.     Defendant NeuStar, a Delaware corporation based in Sterling, Virginia, purports to be a neutral and trusted provider of real-time information services and analytics. NeuStar maintains its principal executive offices at 21575 Ridgetop Circle, Sterling, Virginia 20166. The Company's common stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "NSR." As of April 11, 2014, there were approximately 60.2 million shares of NeuStar stock outstanding.

14.     Defendant Lisa A. Hook ("Hook") is, and was at all relevant times, the Chief Executive Officer and a Director of NeuStar.

15. Defendant Steven J. Edwards ("Edwards") has served as the Company's Senior Vice President, Data Solutions since October 2013. From 2011 to October 2013, Defendant Edwards served as NeuStar's Senior Vice President, Carrier Services.

16. Defendant Paul S. Lalljie ("Lalljie") is, and was at all relevant times, NeuStar's Senior Vice President and Chief Financial Officer.

17. Defendants Hook, Edwards, and Lalljie are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with NeuStar, possessed the power and authority to control the contents of NeuStar's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## BACKGROUND

18. NeuStar purports to be a leading provider of directory and analytic services that are used in critical infrastructure to improve efficiency and increase decision-making capabilities. The Company's primary services include marketing, business assurance, security, data, and data registries. Through NeuStar's data registries business, the Company serves as the administrator and manager of the largest and most complex number portability system, known as

the Number Portability Administration Center, which allows thousands of telecommunications companies to route approximately four billion phone calls and six billion text messages daily, and enables customers to transfer their phone numbers when switching carriers ("NPAC Services").

19.     For approximately 18 years, the Company has been the sole provider of NPAC Services through its role as the Local Number Portability Administrator ("LNPA") for the U.S. The Company began serving as LNPA following the enactment of the Telecommunications Act of 1996 when NeuStar, then a division of Lockheed Martin, was selected by the telecommunications industry and approved by the FCC after engaging in a competitive process. After the Company was approved by the FCC, it entered into a series of contracts with North American Portability Management LLC ("NAPM").

20.     Since the Company began serving as the LNPA, NeuStar has been given three contract extensions without any open process seeking competitive bids.  The Company's incumbent status has allowed it to significantly increase its fees under the NAPM contracts. For instance, the amount of revenue that NeuStar generated under the NAPM contracts was approximately $85 million in 2003, $130 million in 2004 and $189 million in 2005.  In 2013, the Company derived over $446 million in revenue (49% of NeuStar's total revenue) from the NAPM contracts—more than five times the amount of revenue generated in 2003.  In total, NeuStar has generated over $3 billion in revenue from the NAPM contracts since it began serving as LNPA, and achieved staggering 65% margins on those contracts.

21.     Given these escalating costs, telecommunication companies have complained to the FCC that the structure of the NAPM contracts was a serious issue.  Further, Telcordia filed a petition with the FCC in September 2006 that specifically requested NAPM to conduct a new

bidding process to select the LNPA. Again, in January 2009, Telcordia filed another petition with the FCC to abrogate the NAPM contracts and initiate government managed procurement in their place. In light of these petitions, the FCC issued orders on March 8, 2011 and May 16, 2011 for NAPM to complete a new selection process for the administration of NPAC Services at the expiration of the current contracts, which expire in June 2015.

22.     In February 2013, for the first time in approximately 17 years, NAPM issued an RFP and put the NAPM contracts up for rebid. Under the RFP, applicants were required to submit their bids by April 5, 2013.

23.     At the time that NAPM issued the RFP, several market analysts wrote that NeuStar was expected to win the new NAPM contracts. For instance, on February 6, 2013 an RBC Capital Markets analyst wrote that "NeuStar remains the front runner [to win the NAPM contracts] given its incumbency and strong track record." Similarly, an analyst from William Blair & Company also wrote on February 6 that "[w]e believe that NeuStar remains the heavy favorite as the incumbent vendor for the NPAC service in the United States."

24.     On April 5, NeuStar announced that it timely submitted its proposal in response to the RFP.

25.     Then, on April 17, 2013, NAPM unexpectedly announced that it would extend the RFP submission deadline to April 22, which allowed NeuStar competitors to submit their bids. From April 17, NeuStar knew or recklessly disregarded that the extension of the RFP deadline was prejudicial to the Company, increased the substantial risk that it would lose the NAPM contracts, and cast down on the competitiveness of the bid submitted by NeuStar.

26.     The Class Period begins on April 19, 2013, the first trading day after NeuStar issued a press release downplaying the extended RFP submissions deadline and the new

proposals that could be submitted by its competitors.  Specifically, Defendant Edwards stated in

the press release that:

> Neustar filed its response in a timely manner and in accordance
> with the RFP submission requirements.  We remain confident in
> the strength of our proposal and the value to be gained by the
> industry and consumers if we are awarded the contract to continue
> in July 2015 as the local number portability administrator.

27.    The statements and omissions set forth in ¶26 were materially false and

misleading.    Indeed, at the same time that NeuStar was publicly assuring investors through

widely disseminated news releases that it was confident that it would be awarded the new NAPM

contracts, the Company was voicing serious concerns to the FCC about the extension of the RFP

deadline.

28.    For instance, on April 24, 2013, NeuStar filed a letter with the FCC objecting to

the extension because it would "seriously prejudice" vendors that submitted their proposals on

time, and "gives rise to concerns about the ability of one or more bidders to obtain favorable

action based on undisclosed communications with the NAPM or regulators."  According to

NeuStar's letter, the Company "sees no legitimate, even-handed basis for an extension where the

RFP requirements were well publicized far in advance and where an extension perversely favors

bidders unable to meet the deadline."  NeuStar also told the FCC in its April 24 letter that the

Company was concerned "that aspects of its confidential bid have been disclosed to other bidders

prior the extended deadline, including potentially through inadvertent disclosure."  Further, the

Company's letter also expressed concerns that "the deadline extension increases the risk that

bidders would have received some sort of feedback on their failed initial submission prior to the

deadline—to the prejudice of NeuStar and any other bidders who met the deadline."  As a result

of these concerns, NeuStar requested that the FCC and NAPM provide an explanation of the

circumstances giving rise to the extension. Neither the FCC nor NAPM ever provided such an explanation.

29.     On May 2, 2013, NeuStar issued a press release announcing its first quarter results for 2013. In that press release, Defendant Hook assured investors that "[w]e submitted our proposal for the NPAC contract in early April, and we remain confident in our ability to provide world class service to the communications industry." On NeuStar's conference call with analysts describing the Company's first quarter results, also held on May 2, 2013, Defendant Hook further emphasized that "we are confident in the strength of our proposal and it remained unchanged after the deadline extension," and that the Company "delivered a strong proposal to renew the NPAC contract." CEO Hook also stated on the May 2 conference call that the Company submitted "a compelling proposal to renew the NPAC contract."

30.     The statements and omissions set forth in ¶29 were materially false and misleading. The Company did not submit a competitive bid because the Company was attempting to exploit its incumbent status under the current NAPM contracts and preserve as much profit as possible.

31.     Then, on July 23, 2013, without any explanation, NAPM delayed the FCC's approval of the contract award by approximately six months—from August 5, 2013 to January 20, 2014. This delay heightened investors' concerns that the Company would lose its bid for the NAPM contracts. Indeed, J.P. Morgan issued an analyst report on July 23 stating that "the additional extension begs questions about if/why there is more intense consideration on important topics like pricing and competition." To address these concerns, NeuStar continued to assure investors regarding the strength of its proposal and that its position to win the new bid was strong.

32.     For instance, on July 30, 2013, the Company held its earnings conference call for the second quarter of 2013.  On that call, CEO Hook falsely represented that "[w]e remain confident that our NPAC proposal is thorough, compelling and supported by the proven track record of value we provide to our clients and consumers and businesses we serve."  CEO Hook also misled investors into believing that "it's very difficult to imagine that any carrier would choose to put the flawless working of the telecom infrastructure at risk" by splitting the NAPM contracts between several providers.

33.     The statements and omissions set forth in ¶32 were materially false and misleading.  NeuStar knew that it failed to submit the best possible bid for the NAPM contracts and that its bid was not competitive.  The Company's false assurances, however, reassured investors that the Company was competitively positioned to win the NAPM contracts. According to a Deutsche Bank Securities analyst report dated July 31, 2013, Neustar "management continues to sound optimistic about re-winning the bid.  Given the company's performance record over the past 15 years, we continue to believe that NSR will be able to renew the contract, perhaps with some price concessions."

34.     In another unexpected turn of events which raised even further questions regarding NeuStar's ability to win the new contracts, on August 15, 2013, NAPM announced the commencement of a best-and-final offer process for offerors to submit updated responses to NAPM's RFP.  But NeuStar CEO Hook continued to publicly tout the Company's confidence in its original bid, and its ability to be awarded the contract.

35.     Specifically, on October 30, 2013, the Company issued a press release announcing its third quarter results for 2013.  In that press release, Defendant Hook stated that "[w]e have continued to position ourselves for a successful NPAC renewal."  Similarly, on

NeuStar's earnings conference call for its third quarter of 2013, Defendant Hook stated that "[w]e continue to believe that our capabilities and outstanding track record set us apart from other bidders for the next NPAC contract."

36.     These assurances misled investors into believing that NeuStar was well-positioned to win the NAPM contracts.  Indeed, William Blair & Company wrote in an analyst report on October 31, 2013 that "[w]e continue to believe there is a high probability that Neustar will renew its current contract."  But the October 30 press release pointedly did not disclose that the Company had submitted a new bid in September 2013, or that the Company continued to believe that even its revised bid was not competitive.

37.     Accordingly, the statements set forth in ¶35 were materially false and, taken together with the omission of the new bid, were materially misleading.  The Company knew that it was not well positioned to have the NAPM contracts renewed and that its original bid in response to the RFP was not competitive.  In truth, the Company was so concerned that its bid was not competitive that, in September 2013, NeuStar secretly submitted another revised proposal in connection with NAPM's best-and-final offer process.  Then, still concerned about the strength of its revised bid, in October 2013, and again in November 2013, the Company secretly requested that NAPM permit it to revise its proposal.  Together with the October request, the Company also submitted its own revised and more favorable proposal.  At the same time it was asking NAPM to accept a revised proposal (and after having secretly submitted a new bid in September 2013), the Company continued to falsely assure investors that it remained confident in its ability to win the NAPM contracts.

38.     In contrast with NeuStar's assurances to investors, the Company's doubts regarding the new contracts grew so severe that on January 21, 2014, NeuStar CEO Hook called

the FCC Chairman. The fact that this phone call occurred was disclosed in a January 23, 2014 letter from NeuStar to the FCC, which was publicly released by the FCC. The phone call concerned a letter that the Company previously sent to the FCC which, although not publicly released, pertains to the NAPM contracts, and contains information regarding the competitive posture of NeuStar's bid.

39.     In response to the phone call to the FCC, Telcordia filed a letter with the FCC on January 23, 2014 stating that NeuStar's January 23 filing "is extremely irregular, given that the Commission is currently conducting a procurement for one or more LNPA vendors. If what NeuStar has done is to unilaterally seek to alter the terms of its Best and Final Offer, that would be improper and should be disregarded entirely." The January 21, 2014 disclosure of NeuStar's call to the FCC provided the first public indication that NeuStar was engaging in a desperate effort to protect its most important contract.

40.     Then, on January 29, 2014, after the close of trading, NeuStar held its earnings conference call for the fourth quarter of 2013. On that call, the Company revealed for the first time that NeuStar had submitted an additional bid in September 2013 in response to the RFP's best-and-final offer process. NeuStar also disclosed for the first time that in October 2013, and again in November 2013, the Company requested NAPM to reopen the entire RFP bidding process. Together with the Company's October request, NeuStar also submitted a revised proposal which, on January 24, 2014, NAPM told the company would not be considered.

41.     This news shocked analysts. According to a report issued by J.P. Morgan on January 30, 2013, NeuStar's "unsolicited new fall submission caught everyone by surprise" and "is generating a lot of concern that [the Company's] position was not as strong as first thought, pricing might be worse, and a number of other concerns." Similarly, William Blair & Company

wrote in an analyst report on January 30 that "we are concerned that the company may have been able to offer lower pricing than the amount stipulated in its best-and-final-offer bid in September 2013. The NAPM's lack of a response and the FCC's delay in approval also add to investor anxiety that the company's chances of renewing the contract may not be as strong as anticipated."

42.     Nevertheless, CEO Hook continued to assure investors in a press release issued on January 29 that "[w]e believe that given our track record in innovating to meet the industry's needs, as well as our exceptional stewardship of the NPAC, we are the logical choice to be the local number portability administrator over the next contract period." While Defendant Hook's assurances limited the decline in the price of NeuStar stock, the disclosures that NeuStar was submitting secret unsolicited bids to improve its competitive standing to win the new NAPM contracts caused the price of the Company's stock to decline from $43.75 per share to $35.11 per share, or almost 20%.

43.     On February 6, 2014, Telcordia wrote a letter to the FCC complaining that NeuStar had illegally received confidential information that drove the Company to attempt to change its bid in October 2013 to be more competitive. According to Telcordia, NeuStar failed to offer its most competitive price and was instead trying to preserve as much premium associated with its monopoly and incumbent status as possible. This is significant because during the time that the Company was publicly touting its confidence in its proposal, NeuStar was not even submitting its best possible bids for the NAPM contracts. Telcordia's letter has prompted an FCC investigation into any improper dealings that NeuStar may have had with the FCC.

44.     Significantly, in response to Telcordia's letter, on February 12, NeuStar filed a petition with the FCC to direct NAPM to pursue additional proposals. In that petition, the Company again acknowledged that NAPM's extension of the RFP deadline benefitted other offerors, including Telcordia, putting NeuStar at a competitive disadvantage. Telcordia responded to the Company's petition, stating that the petition is "an Olympian effort to change the rules and get a do-over after flubbing its last run. The commission should recognize this petition for what it is—a meritless, last-ditch desperation ploy by a company that had an opportunity for input into every stage of the process."

45.     Despite these facts, Defendants continued to falsely assure investors regarding the Company's standing to win the new NAPM contracts throughout the remainder of the Class Period. For instance, on April 16, 2014, NeuStar issued a press release announcing its first quarter results for 2014 in which Defendant Hook stated that "[w]e are competing vigorously in the LNPA vendor selection process, and will continue to advocate strongly that we are the logical choice to remain as administrator, which we believe is beneficial to the industry and consumers alike." Similarly, on NeuStar's earnings conference call for the first quarter of 2014 also held on April 16, Defendant Hook reassured investors that "[w]e have participated in the LNPA vendor selection process, confident that an objective appraisal of our qualifications to continue managing the NPAC and the value of our proposal should place us in a strong position for a renewal of the contract." Defendant Lalljie also reassured investors on the Company's April 16 conference call that "we have made it abundantly clear that we are the logical choice to provide this service. We've been doing it with excellence for 17-plus years, and we fully expect that we will continue to do this into the future."

46. The statements and omissions set forth in ¶45 were materially false and misleading. NeuStar knew or recklessly disregarded that its September 2013 bid was not competitive and that it was therefore at serious risk of losing the NAPM contracts and that if the Company was retained under the RFP, that the terms of the new contracts would be significantly less favorable to NeuStar.

47. On June 6, 2014, after the close of trading, the FCC inadvertently disclosed an email revealing that NeuStar was not expected to win the NAPM contracts. A copy of that email, which was sent to the FCC by the North American Numbering Council ("NANC"), which is responsible for making a recommendation to the FCC regarding who should win the new contracts, was accidently posted to the FCC docket and made public. In the email, NANC recommended that the FCC award the contract to Telcordia. The disclosure of this email caused the price of Neustar stock to drop from $26.67 per share to $24.43 per share, or over 8%.

48. Subsequent to the close of the Class Period, on June 9, 2014, the FCC issued a public notice stating that NANC unanimously recommended against awarding the NAPM contracts to NeuStar in favor of Telcordia. According to the notice, NANC reached this decision in a meeting on March 26, 2014.

## LOSS CAUSATION

49. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of NeuStar common stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on January 29, 2014 and June 6, 2014, the price of NeuStar common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their

purchases of NeuStar common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of NeuStar during the Class Period (the "Class").   Excluded from the Class are Defendants and their families, directors, and officers of NeuStar and their families and affiliates.

51.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of April 11, 2014, there were approximately 60.2 million shares of NeuStar common stock outstanding, owned by hundreds or thousands of investors.

52.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.    Whether Defendants violated the Exchange Act;

B.    Whether Defendants omitted and/or misrepresented material facts;

C.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.    Whether the price of NeuStar common stock was artificially inflated;

F.      Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.      The extent of damage sustained by Class members and the appropriate measure of damages.

53.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

54.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

55.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

56.     NeuStar's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

57.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of NeuStar who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants

expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

58.     At all relevant times, the market for NeuStar's common stock was an efficient market for the following reasons, among others:

A.      NeuStar stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

B.      As a regulated issuer, NeuStar filed periodic public reports with the SEC and the New York Stock Exchange;

C.      NeuStar regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.      NeuStar was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).   Each of these reports was publicly available and entered the public marketplace.

59.     As a result of the foregoing, the market for NeuStar securities promptly digested current information regarding NeuStar from all publicly available sources and reflected such information in the price of NeuStar stock.  Under these circumstances, all purchasers of NeuStar common stock during the Class Period suffered similar injury through their purchase of NeuStar common stock at artificially inflated prices and the presumption of reliance applies.

19

60.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding NeuStar's standing to win the NAPM contracts—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the NAPM contracts to NeuStar's business, as set forth above, that requirement is satisfied here.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase NeuStar common stock at artificially inflated prices.

63.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for NeuStar common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

65.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal NeuStar's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

67.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NeuStar common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for NeuStar common stock had been artificially inflated by Defendants' fraudulent course of conduct.

68.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

69.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

70.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of NeuStar within the meaning of Section 20(a) of the Exchange Act.   By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about NeuStar, the Individual Defendants had the power and ability to control the actions of NeuStar and its employees.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

<u>**PRAYER FOR RELIEF**</u>

72.     WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

**JURY DEMAND**

73.   Plaintiff demands a trial by jury.

DATED: July 15, 2014

<div style="margin-left:40%">

**COHEN MILSTEIN SELLERS
& TOLL PLLC**

*Elizabeth Aniskevich*

Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
Elizabeth A. Aniskevich (Va. Bar. No. 81809)
1100 New York Ave., N.W.
Suite 500, East Tower
Washington, D.C.  20005-3965
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
eaniskevich@cohenmilstein.com

*Local Counsel for Proposed Lead Plaintiff
Oklahoma Firefighters Pension and
Retirement System*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

Gerald H. Silk
Avi Josefson
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554 1400
Facsimile:  (212) 554 1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Proposed Lead Plaintiff Oklahoma
Firefighters Pension and Retirement System
and Proposed Lead Counsel for the Class*

</div>

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Robert E. Jones, Jr., on behalf of Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Oklahoma Firefighters.  I have reviewed the complaint and authorize its filing.

2. Oklahoma Firefighters did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Oklahoma Firefighters is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Oklahoma Firefighters' transactions in the Neustar, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Oklahoma Firefighters has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Miller Energy Resources, Inc., Securities Litigation*, Case No. 11-cv-386 (E.D. Tenn.)
*Oklahoma Firefighters Pension & Retirement System, et al., v. Student Loan Corp., et al.,*
Case No. 12-cv-895 (S.D.N.Y.)
*In re Mako Surgical Corporation Securities Litigation*, Case No. 12-60875 (S.D. Fla.)
*Reinschmidt v. Zillow, Inc., et al.*, Case No. 12-cv-2084 (W.D. Wash.)
*Fialkov v. Microsoft Corp., et al.*, Case No. 13-cv-2039 (W.D. Wash.)
*In re Tower Group International, Ltd. Securities Litigation*, Case No. 13-cv-5852 (S.D.N.Y.)
*In re Edwards Lifesciences Corp. Securities Litigation*, Case No. 13-cv-1463 (C.D. Cal.)
*Santore v. Ixia et al.*, Case No. 13-cv-8440 (C.D. Cal.)
*In re K12, Inc. Securities Litigation*, Case No 14-cv-108 (E.D. Va.)

6. Oklahoma Firefighters has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

*Wallace v. Intralinks Holdings, Inc., et al.*, Case No. 11-cv-8861 (S.D.N.Y.)
*Hoppaugh v. K12 Inc., et al.*, Case No. 12-cv-103 (E.D. Va.)
*Sanders v. VeriFone Systems, Inc., et al.*, Case No. 13-cv-1038 (N.D. Cal.)
*Mazzaferro v. Aruba Networks, Inc., et al.*, Case No. 13-cv-2342 (N.D. Cal.)
*Singh v. Orthofix International N.V., et al.*, Case No. 13-cv-5696 (S.D.N.Y.)
*Rieckborn v. Velti plc, et al.*, Case No. 13-cv-3889 (N.D. Cal.)
*Hatamian, et al., v. Advanced Micro Devices, Inc., et al.*, Case No. 14-cv-226 (N.D. Cal.)

7. Oklahoma Firefighters is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following actions filed under the federal securities laws during the three years preceding the date of this Certification:

> *Awad v. Herbalife Ltd., et al.*, Case No. 14-cv-2850 (C.D. Cal.)

8. Oklahoma Firefighters will not accept any payment for serving as a representative party on behalf of the Class beyond Oklahoma Firefighters' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10th day of July, 2014.

Robert E. Jones, Jr.
Executive Director
*Oklahoma Firefighters Pension and
Retirement System*

**Oklahoma Firefighters Pension and Retirement System**
**Transactions in Neustar**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 10/17/2013 | 170 | $47.3468 |
| Purchase | 10/31/2013 | 5,120 | $45.6605 |
| Purchase | 10/31/2013 | 3,400 | $45.8667 |
| Purchase | 11/1/2013 | 2,700 | $45.7595 |
| Purchase | 11/1/2013 | 1,000 | $45.7973 |
| Purchase | 11/1/2013 | 2,000 | $45.8870 |
| Purchase | 11/1/2013 | 700 | $45.9311 |
| Purchase | 11/4/2013 | 900 | $46.5819 |
| Purchase | 11/4/2013 | 100 | $46.3899 |
| Purchase | 11/5/2013 | 1,500 | $46.4885 |
| Purchase | 11/6/2013 | 400 | $46.6059 |
| Purchase | 11/7/2013 | 200 | $46.6562 |
| Purchase | 11/15/2013 | 2,293 | $47.7509 |
| Purchase | 1/24/2014 | 3,460 | $45.5884 |
| Purchase | 3/17/2014 | 531 | $33.4929 |
| Purchase | 3/17/2014 | 3,488 | $33.6002 |
| Purchase | 3/17/2014 | 1,400 | $33.6459 |
| Purchase | 3/17/2014 | 259 | $33.5300 |
| Purchase | 3/18/2014 | 85 | $34.4636 |
| Purchase | 3/18/2014 | 985 | $34.6588 |
| Purchase | 3/19/2014 | 2,712 | $34.5221 |
| Purchase | 3/20/2014 | 3,488 | $34.5348 |
| Purchase | 3/20/2014 | 1,088 | $34.5950 |
| Purchase | 3/21/2014 | 1,824 | $34.2807 |
| Purchase | 3/21/2014 | 1,310 | $34.2781 |
| Purchase | 3/24/2014 | 2,102 | $34.4955 |
| Purchase | 3/24/2014 | 581 | $34.3395 |
| Purchase | 3/25/2014 | 1,495 | $34.3895 |
| Purchase | 3/25/2014 | 753 | $34.4057 |
| Purchase | 3/25/2014 | 1,225 | $34.3838 |
| | | | |
| Sale | 7/5/2013 | (990) | $51.4062 |
| Sale | 7/8/2013 | (4,920) | $51.4356 |
| Sale | 7/9/2013 | (1,580) | $51.4054 |
| Sale | 7/10/2013 | (1,930) | $51.3843 |
| Sale | 11/22/2013 | (500) | $48.8657 |
| Sale | 11/22/2013 | (2,400) | $48.8189 |
| Sale | 11/22/2013 | (500) | $48.9000 |
| Sale | 11/25/2013 | (2,000) | $49.0293 |
| Sale | 11/25/2013 | (1,100) | $48.9972 |
| Sale | 11/26/2013 | (500) | $49.0351 |
| Sale | 11/27/2013 | (1,000) | $48.4537 |
| Sale | 11/29/2013 | (2,200) | $48.5652 |
| Sale | 12/2/2013 | (300) | $49.6123 |
| Sale | 12/3/2013 | (300) | $49.3292 |
| Sale | 12/4/2013 | (200) | $49.0355 |
| Sale | 12/4/2013 | (100) | $49.0550 |
| Sale | 12/4/2013 | (400) | $49.1450 |
| Sale | 12/5/2013 | (600) | $48.5344 |

**Oklahoma Firefighters Pension and Retirement System**
**Transactions in Neustar**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 12/5/2013 | (200) | $48.3025 |
| Sale | 12/6/2013 | (1,100) | $49.1652 |
| Sale | 12/9/2013 | (500) | $49.2097 |
| Sale | 12/10/2013 | (500) | $49.1286 |
| Sale | 12/10/2013 | (1,000) | $49.1850 |
| Sale | 12/11/2013 | (100) | $49.1811 |
| Sale | 12/12/2013 | (500) | $48.2264 |
| Sale | 12/13/2013 | (100) | $48.4450 |
| Sale | 12/13/2013 | (500) | $48.4241 |
| Sale | 12/16/2013 | (300) | $48.8773 |
| Sale | 12/17/2013 | (500) | $48.5654 |
| Sale | 12/18/2013 | (775) | $48.7942 |
| Sale | 3/19/2014 | (8,025) | $34.8358 |
| Sale | 3/20/2014 | (1,123) | $34.5084 |
| Sale | 3/20/2014 | (358) | $34.5706 |
| Sale | 3/21/2014 | (350) | $34.2808 |
| Sale | 3/21/2014 | (495) | $34.3752 |
| Sale | 3/21/2014 | (1,481) | $34.3071 |
| Sale | 3/24/2014 | (649) | $34.3650 |
| Sale | 3/24/2014 | (167) | $34.0934 |
| Sale | 3/24/2014 | (804) | $34.4950 |
| Sale | 3/25/2014 | (148) | $34.4525 |
| Sale | 4/22/2014 | (6,881) | $29.3141 |
| Sale | 4/29/2014 | (8,225) | $25.5500 |
| Sale | 5/2/2014 | (7,253) | $26.0863 |
| Sale | 5/5/2014 | (16,073) | $26.2295 |