IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| ) | | |
| ) | | |
| ) | | |
| IN RE NEUSTAR SECURITIES | ) | 1:14cv885(JCC/TRJ) |
| LITIGATION | ) | |
| ) | | |
| ) | | |
| ) | | |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendants'
Neustar, Inc. ("Neustar"), Lisa A. Hook ("Hook"), Paul S.
Lalljie ("Lalljie"), and Steven J. Edwards ("Edwards")[1]
(collectively "Defendants") Motion to Dismiss.  [Dkt. 30.]  For
the following reasons, the Court will grant the motion.

**I. Background**

This case concerns the bidding process to win a
lucrative government contract.  Neustar, a communications data
processing company, is the Local Number Portability
Administrator ("LNPA").  (Am. Compl. [Dkt. 23] ¶ 1, 21.)  Number
portability allows telephone customers to retain their phone
number if they switch telephone service providers.  (*Id.*)
Neustar, as the LNPA, manages the Number Portability
Administration Center ("NPAC"), a large central data registry

---

[1] Hook, Lalljie, and Edwards are referred to as the "Individual Defendants."

1

that includes essentially all of the wireline and wireless telephone numbers in the United States and allows numbers to be transferred from one service provider to another. (*Id.*) Neustar's predecessor won the only open-bidding process for this contract. (*Id.* ¶ 37.) As such, it has been the sole LNPA since the NPAC was created in 1997. (*Id.*) Neustar's contract has been extended three times. (*Id.*) The current extension is set to expire in July 2015. (*Id.* ¶ 71.)

The counter-party to the NPAC contract is North American Portability Management LLC ("NAPM"), which represents all of the telecommunications service providers in the United States. (*Id.* ¶ 30.) The Federal Communications Commission ("FCC") has plenary authority over number portability, but is not a party to the LNPA contract. (*Id.* ¶ 34.) Rather, the FCC has delegated authority to the North American Numbering Council ("NANC"), which then reviews and oversees NAPM's management of the NPAC contracts. (*Id.*)

In 2010, the FCC put the wheels in motion to solicit requests for proposals ("RFPs") to select the next LNPA. (*Id.* ¶ 43.) As relevant here, the RFPs were due on April 5, 2013. (*Id.* ¶ 50.) On April 17, 2013 NAPM unexpectedly announced that, with the FCC's approval, it was extending the deadline for the submission of proposals to April 22, 2013. (*Id.*) Neustar released a press release on the deadline extension the next day.

2

(*Id.* ¶ 101.)[2]  In the press release, Edwards, senior vice president of Data Solutions, stated:

> Neustar successfully submitted its proposal on April 5, 2013, which was the deadline previously announced by the NAPM.  The RFP process has been a matter of public record since May 2011, was subject to a robust public comment process, and the deadline for submission of responses was published 60 days in advance of the filing deadline.  The process was designed to promote competition and provided interested parties with sufficient time to meet the submission requirements. Neustar filed its response in a timely manner and in accordance with the RFP submission requirements. **We remain confident in the strength of our proposal and the value to be gained by the industry and consumers** if we are awarded the contract to continue in July 2015 as the local number portability administrator.

(*Id.* ¶ 102) (emphasis in original).  Telcordia, a division of Ericsson, submitted its bid on April 22.  (*Id.* ¶ 52.)

On April 24, Neustar wrote to the FCC regarding the RFP deadline extension, which it filed on the agency's public docket.  (*Id.* ¶ 55; Pl.'s Opp. [Dkt. 37] at 4.)  Neustar stated that extending the deadline after it had already submitted its bid "perversely favor[ed] bidders unable to meet the deadline" and "raises the risk that aspects of its confidential bid have been disclosed to other bidders prior to the extended deadline,

---

[2] This press release, as well as all other releases referenced in this Memorandum Opinion, were signed by Lalljie, Neustar's senior vice president and chief financial officer, and were filed with the SEC the same day as release as an exhibit to a Form 8-K Current Report.  (Am. Compl. [Dkt. 23] ¶¶ 101, 108, 121, 129, 140.)

including potentially through inadvertent disclosure, which would seriously prejudice Neustar." (*Id.*)  The decision, Neustar argued, "gives rise to concerns about the ability of one or more bidders to obtain favorable action based on undisclosed communications with the NAPM or with regulators." (*Id.* ¶ 56.)

Hook, Neustar's president and CEO, disclosed the April 24 letter to the FCC in her opening remarks on the May 2 first quarter earnings conference call,[3] "emphasizing our concern that extending the deadline was inconsistent with the industry's and the FCC's commitment to manage a transparent and timely RFP process." (*Id.* ¶ 111.)  She then stated "we are confident in the strength of our proposal and it remained unchanged after the deadline extension." (*Id.*)  Later in the call, Hook stated that Neustar "delivered a strong proposal to renew the NPAC contract." (*Id.*)  She closed the call by reiterating that Neustar "submit[ted] a compelling proposal to renew the NPAC contract." (*Id.*)  On the same day as the call, Neustar released a press release on its 2013 first quarter financial results. (*Id.* ¶ 108.)  In the press release, Hook stated: "We submitted our proposal for the NPAC contract in early April, and we remain confident in our ability to provide world class [sic] service to the communications industry." (*Id.* ¶ 109.)

---

[3] Lalljie and Neustar's head of investor relations participated in this earnings call and all subsequent earnings calls hereinafter referenced. (Am. Compl. ¶¶ 111, 117, 123, 133, 142.)

On July 23, 2013 NAPM announced a delay in the LNPA selection timeline. (*Id.* ¶ 58.) NANC would submit its recommendation to the FCC by November, and the FCC would make a final selection in January 2014. (*Id.*) Seven days later, on July 30, Hook acknowledged this delay on Neustar's second quarter earnings call, but stated that "[w]e remain confident that our NPAC proposal is thorough, compelling and supported by the proven track record of value we provide to our clients and consumers and businesses we serve." (*Id.* ¶ 117.)

Soon thereafter, NAPM, unsatisfied with the April bids, asked Telcordia and Neustar to submit their best and final offers ("BAFO"). (*Id.* ¶ 60.) The deadline was in September, and both companies met the deadline. (*Id.* ¶ 61.) However, on October 21, 2013, Neustar privately wrote to NAPM, delivering an unsolicited second BAFO and asking NAPM to consider it in place of its September bid. (*Id.* ¶ 63.)

On October 30, Hook reiterated her confidence in Neustar's ability to continue as the LNPA. In the third quarter earnings press release, she stated: "We have continued to position ourselves for a successful NPAC renewal." (*Id.* ¶ 122.) On the third quarter earnings call, she told participants that "[w]e continue to believe that our capabilities and outstanding track record set us apart from other bidders for the next NPAC contract." (*Id.* ¶ 123.) Just a few short days later, on

November 3, Neustar privately renewed its request to submit a second BAFO. (*Id.* ¶ 67.)

Still without an answer, Hook wrote a letter to the FCC and NAPM dated January 15, 2014, asking them to consider Neustar's second BAFO. (*Id.* ¶ 74.) Hook followed the letter with a call to FCC Chairman Tom Wheeler on January 21. (*Id.*) On January 23, Neustar disclosed the call and first letter in a redacted letter filed on the FCC's docket. (*Id.*) Public viewers of the letter only saw the redaction notice. (*Id.*) One day later, NAPM rejected Neustar's request to consider the second BAFO. (*Id.* ¶ 80.)

On January 29, Neustar issued three press releases after the close of trading: (1) one announcing its financial results for both year end and the fourth quarter of 2013; (2) one announcing an update on the LNPA selection process; and (3) one announcing a share repurchase program. (*Id.* ¶ 129.) The LNPA update press release disclosed that:

> [t]hroughout the NPAC administrator selection process, Neustar has fully responded to each deadline and request. In April 2013, Neustar submitted an initial proposal according to the process and subsequently responded to the North American Portability Management LLC's (NAPM) request for a revised submission. In October 2013, the company requested the opportunity for all bidders to submit additional revised proposals. Together with that request, the company also submitted a revised proposal. On January 24, 2014, the company was

notified that its October 2013 proposal
would not be considered.

(*Id.* ¶ 130.)  Hook stated in the press release that "[w]e

believe that given our track record in innovating to meet the

industry's needs, as well as our exceptional stewardship of the

NPAC, we are the logical choice to be the local number

portability administrator over the next contract period." (*Id.*

¶ 131.)

That same day, Neustar hosted a conference call to

discuss its financial results and the status of the NAPM

contract selection process.  Defendants revealed for the first

time the existence of the October BAFO, its attempts to have the

FCC and NAPM re-open bidding to consider it, and that it had

been "returned unopened," i.e., not considered.  (*Id.* ¶ 132.)

When asked by an analyst why the second proposal was necessary,

Hook answered:

> I think that we can all sharpen our pencils
> on overall value.  As I said in my prepared
> remarks, multiple rounds are always
> important in complex negotiations.  We think
> that there should be particular attention
> paid here to transition, costs and risk for
> all members of the industry, as well as a
> focus on the transition to IP, which is
> becoming more and more urgent.  Any
> transition wouldn't necessarily disrupt that
> innovation.

(*Id.* ¶ 133.)  The price of Neustar stock dropped by almost

twenty percent, from $43.75 at the close of trading on January

29 to $35.11 per share at the close of trading January 30.[4]  (*Id.* ¶ 139.)

On February 12, 2014 Neustar filed a formal petition asking the FCC to submit additional bids.  (*Id.* ¶ 87.)  One month later, Neustar wrote to NANC asking it to delay its recommendation, offering $50 million credit on the existing LNPA contract.  (*Id.* ¶ 91.)  On April 16, Neustar released a press release on its first quarter earnings for 2014.  (*Id.* ¶ 140.)  In the release, Hook stated that "[w]e are competing vigorously in the LNPA vendor selection process, and will continue to advocate strongly that we are the logical choice to remain as administrator, which we believe is beneficial to the industry and consumers alike."  (*Id.* ¶ 140.)  That same day, Neustar held a conference call on its first quarter financial results and the status of the NAPM contract renewal process.  During the call, Hook stated:

> [w]e have participated in the LNPA vendor selection process, confident that an objective appraisal of our qualifications to continue managing the NPAC and the value of our proposal should place us in a strong position for a renewal of the contract.  We continue to advocate that an additional round of bidding is necessary to evaluate objectively qualified vendors, and to ensure that the NPAC Contract will be awarded to

---

[4] Lead Plaintiff alleges that this price decline is statistically significant. Trading volume on January 30, 2014 was 7,734,300 shares, more than 15 times the average daily volume of 489,685 shares during the immediately preceding 12 months.  (Am. Compl. ¶ 139.)

> the vendors that offers [sic] the best value
> proposition to the industry and to American
> consumers.

(*Id.* ¶ 142.)  Lalljie, Neustar's senior vice president and chief financial officer, stated on the call that "we have made it abundantly clear that we are the logical choice to provide this service.  We've been doing it with excellence for 17-plus years, and we fully expect that we will continue to do this into the future."  (*Id.* ¶ 143.)

On June 6, 2014, it was inadvertently disclosed that NANC recommended Telcordia's bid for the NAPM contract to the FCC.  (*Id.* ¶ 92.)  Neustar disclosed this in a press release on June 9, 2014, the first business day after the information was leaked.  (*Id.* ¶ 93.)  The stock lost another eight percent in value.

Oklahoma Firefighters Pension and Retirement System filed suit in this Court on July 15, 2014.  [Dkt. 1.]  On September 15, Indiana Public Retirement System ("Lead Plaintiff") moved to be appointed lead plaintiff and its attorneys lead counsel [Dkt. 2], which this Court granted.  [Dkt. 11.]  Lead Plaintiff filed the amended complaint, alleging three causes of action: (1) violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Neustar

(Am. Compl. ¶¶ 193-204); (2) identical violations, as against the Individual Defendants (*Id.* ¶¶ 205-216); and (3) violations of section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), as against the Individual Defendants (*Id.* ¶¶ 217-219).  The proposed class period is from April 19, 2013 to June 6, 2014.  (*Id.* at 1.)  Neustar and the Individual Defendants have moved to dismiss, arguing Lead Plaintiff has failed to plead any actionable statements, failed to plead facts raising a strong inference of scienter, and failed to plead loss causation.  (Defs.' Mem. in Supp. [Dkt. 32] at 11-28.)  Having been fully briefed and argued, this motion is ripe for disposition.

## II. Legal Standard

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint[.]" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted).  The Supreme Court has stated that in order "[t]o survive a motion to dismiss, a [c]omplaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.*  The issue in resolving such a motion is not whether the non-movant will ultimately prevail, but whether the non-movant is entitled to offer evidence to support his or her claims.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citations omitted). To survive a motion to dismiss, a plaintiff's complaint must demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Legal conclusions couched as factual allegations are not sufficient. *Twombly*, 550 U.S. at 555.  Hence, a pleading that offers only "formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.  Nor will a complaint that tenders mere "naked assertion[s]" devoid of "further factual enhancement." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

Moreover, the plaintiff does not have to show a likelihood of success on the merits.  Rather, the complaint must merely allege – directly or indirectly – each element of a "viable legal theory." *Twombly*, 550 U.S. at 562-63.

### III. Analysis

#### A. 10b and 10b-5 violations

The elements of a cause of action under Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder are:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation (that is, the economic loss must be proximately caused by the misrepresentation or omission).

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).

Lead Plaintiff challenges the following statements:

- Neustar's April 19, 2013 press release, in which Edwards expresses confidence in the strength of Neustar's proposal;

- Neustar's May 2, 2013 press release and earnings call, in which Hook expresses confidence in the strength of Neustar's proposal and discusses the appearance of impropriety in the unexpected extension of the RFP deadline;

- The July 2013 earnings call, in which Hook expresses confidence in Neustar's positioning to win the contract;

- The October 30, 2013 earnings call and press release, in which Hook describes Neustar's positioning to win the contract;

- The January 29, 2013 earnings call and press release, in which Hook disclosed the existence of the October BAFO and discussing the bidding process for the contract;

- The April 16, 2013 earnings call and press release, in which Hook and Lalljie expressed why Neustar was the "logical choice" to continue as LNPA.

Defendants argue that Lead Plaintiff has failed to adequately plead elements one (and by implication, three), two, and six.

## 1. Loss Causation

The Court turns first to loss causation, as this case presents a question as to whether there has been a realization of any loss.  Loss causation is an essential element of a cause of action for securities fraud under Section 10b and Rule 10b-5, requiring plaintiff to plead and prove that the "act of omission of the defendant alleged to violate this chapter cased the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).

A plaintiff must plead loss causation "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists" between the material

misrepresentations or omissions and the economic loss.
*Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 186 (4th Cir. 2007).  A plaintiff does not have to allege the precise loss attributable to a defendant's fraud, but rather that the misrepresentation or omission was "one substantial cause of the investment's decline in value." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011) (citation and internal quotation marks omitted).

Plaintiff argues that Defendants' statements of confidence "concealed the significant, escalating risk caused by Defendants' calculated strategy to overbid and bank solely on technical, non-price qualifications in an effort to preserve the premium associated with Neustar's incumbent, monopoly status." (Pl.'s Opp. at 2.)  Stated differently, Plaintiff alleges that Defendants' statements concealed the risk that Neustar would not win renewal of the NAPM contract.  However, this risk has not yet materialized.  Though the NAPC has recommended the FCC award the contract to Telcordia, the FCC has not yet made a final determination.  (*See* Defs.' Mem. in Supp. at 25.)  And such a risk may never materialize.  On November 7, 2014, the FCC sought public comment on Neustar's February 2014 formal petition to submit additional bids.  (*Id.* at 8.)  While there is a chance that Neustar may *not* be awarded the NAPM contract, there is still a possibility that it *will*, in fact, win the contract.

14

Therefore, Lead Plaintiff has failed to sufficiently plead loss causation.

### 2. Actionable Statements

#### a. Puffery

Defendants argue that the statements at issue are puffery. In the alternative, Defendants argue they are forward-looking statements that are entitled to protection under either or both the Private Securities Litigation Reform Act's ("PSLRA") safe harbor and the bespeaks caution doctrine. (Defs.' Mem. in Supp. at 11-20.)

Pursuant to the PSLRA, the complaint must aver "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (2004); *see Nolte v. Capital One Fin. Corp.*, 390 F. 3d 311, 315 (4th Cir. 2004).

"Indefinite statements of corporate optimism, also known as puffery, are generally non-actionable, as they do not demonstrate falsity." *Carlucci v. Han*, 886 F. Supp. 2d 497, 522 (E.D. Va. 2012) (citations and internal quotation marks omitted). Furthermore, courts are likely to find puffery immaterial, as a matter of law, because such statements are

> a certain kind of rosy affirmation commonly heard from corporate managers and familiar to the marketplace — loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

*In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 766-67 (E.D. Va. 2004); *see Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) ("'Soft,' 'puffing' statements ... generally lack materiality because the market price of the share is not inflated by vague statements predicting growth.  The whole discussion of growth is plainly by way of loose prediction . . . [n]o reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market.").

Here, Neustar's statements are puffery and thus cannot give rise to securities fraud.  All of the statements at issue relate to Neustar and its officers' confidence in its position in the market.  These "loosely optimistic" statements are vague enough that no reasonable investor would find them dispositive in the total mix of information available in deciding what stocks to purchase.  As the Fourth Circuit stated:

> [a]nalysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen.  The market gives the most credence to those predictions supported by specific statements of fact, and those

16

> statements are, of course, actionable if
> false or misleading. However, projections of
> future performance not worded as guarantees
> are generally not actionable under the
> federal securities laws.

*Raab*, 4 F.3d at 289-90 (citation and internal quotation marks

omitted). That is because "[p]redictions of future growth . . .

will almost always prove to be wrong in hindsight." *Id.* at 290.

Indeed, if Hook and other corporate officers were to refrain

from such statements of confidence, or take a pessimistic

outlook on the company's future, stockholders might well

question the company's prospects under current leadership. *See*

*Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("People in

charge of an enterprise are not required to take a gloomy,

fearful or defeatist view of the future; subject to what current

data indicates, they can be expected to be confident about their

stewardship and the prospects of the business that they

manage.") (citation and internal quotation marks omitted).

Other courts have found similar statements puffery.

*See Boca Raton Firefighters and Police Pension Fund v. Bahash*,

506 F. App'x 32, 37 (2d Cir. 2012) (holding the following

statement puffery: "The integrity, reliability and credibility

of [the defendant] has enabled us to compete successfully in an

increasingly global and complex market, and that is true today

and we are confident it will be so in the future."); *San Leandro*

*Emergency Med. Plan. v. Philip Morris Co., Inc.*, 75 F.3d 801,

17

807, 811 (2d Cir. 1996) (holding not actionable statements that the company "expect[ed] ... another year of strong growth in earnings per share"); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 213-14 (4th Cir. 1994) (finding the following statement a belief or opinion about uncertain future performance: "[the company] is on target toward achieving the most profitable year in its history") (citing *Raab*, 4 F.3d at 290); *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (stating that statements like "[w]e continue to demonstrate the viability of our growth strategy" "[w]e continue to enhance our position as a leader in the automotive industry" and "the Company is on target to achieve projected 'synergies' and cost savings" are the sort of "vague statements predicting growth" that are puffery); *In re Caere Corporate Sec. Litig.*, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) (finding the following statement not actionable under the securities laws: "[The company is] 'well positioned' for growth."); *Colby v. Hologic, Inc.*, 817 F. Supp. 204, 211 (D. Mass. 1993) (finding the following forward-looking statement too vague to be actionable: "Prospects for long term growth are bright.")

        Therefore, Lead Plaintiff has failed to demonstrate that these statements were material, failing to satisfy elements one and three of a cause of action under Section 10(b) and Rule

10b-5. *See Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 548 (M.D.N.C. 2013) (stating the goal of the securities laws are primarily to regulate declaratory statements of fact) (quoting *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994)).

### b. Forward-looking statements

Defendants also argue that the statements are protected by the PSLRA's safe harbor provision and the judicially-created doctrine of bespeaks caution. Under the PSLRA, a forward-looking statement is defined as:

> (A) . . .
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or servicers of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC];
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
>
> . . .

15 U.S.C. § 78u-5(i)(1)(B)-(D). A forward-looking statement is subject to safe harbor when it is identified as such and accompanied by "meaningful cautionary language identifying factors that could cause actual results to differ materially

19

from those in the forward-looking statement," immaterial, or the plaintiff fails to prove that the statement was false.[5]  15 U.S.C. § 78u-5(c)(1)(A)-(B).

The statements at issue are forward-looking, as they concern the "plan and objectives of management for future operations," namely, Neustar's objective of being awarded the new NPAC contracts and continuing as LNPA after June 2015.  *See Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 147 (4th Cir. 2002) (stating that the statements about future dividend payments are forward-looking because they relate to "future economic performance") (citing 18 U.S.C. § 78u-5(i)(1)(D)).  As noted above, the statements are immaterial.  Therefore, they fall within the PSLRA's safe harbor.

Even if the statements were material, however, they are accompanied by meaningful cautionary language.  Neustar's 2012 10-K stated in boldface that the NAPM contracts "represent in the aggregate a substantial portion of our revenue, are not exclusive, and could be terminated or modified in ways unfavorable to us.  These contracts are due to expire in June

---

[5] Subsection (B) states the statement is entitled to safe harbor if the plaintiff fails to prove that the forward-looking statement
    (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
    (ii) if made by a business entity; was--
        (I) made by or with the approval of an executive officer of that entity; and
        (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.
15 U.S.C. § 78u-5(c)(1)(B).

2015 and we may not win a competitive procurement." (Defs.'
Mem. in Supp. at 15; Defs.' Mem. in Supp., Ex. 4, at 19.)[6]  The
press releases also state that "the Company cannot assure you
that its expectations will be achieved or that any deviations
will not be material." (*Id.*)  Additional language in the press
releases advised of potential unforeseen risks. (*Id.*)  Similar
warnings were given during the earnings calls. (Defs.' Mem. in
Supp. at 14-15.)  Therefore, even if the statements were
material, there was sufficient cautionary language to put
investors on notice that there were risks associated with the
RFP process for the NAPM contract.

        Additionally, Lead Plaintiff has failed to plead facts
showing that Neustar and the Individual Defendants knew the
statements were false.  Lead Plaintiff points to several events
that it contends are indicative of falsity.  First, Lead
Plaintiff argues that Defendants knew that the unexpected
extension of the bid deadline from April 5 to April 22

---

[6] Generally, a district court does not consider extrinsic materials when
evaluating a complaint under Rule 12(b)(6).  It may, however, consider
"documents incorporated into the complaint by reference." *Tellabs, Inc. v.
Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007); *see also Blankenship
v. Manchin,* 471 F.3d 523, 526 n.1 (4th Cir. 2006).  In addition, the court
may consider documents attached to the defendant's motion to dismiss if those
documents are central to the plaintiff's claim or are "sufficiently referred
to in the complaint," so long as the plaintiff does not challenge their
authenticity. *Witthohn v. Fed. Ins. Co.,* 164 F. App'x 395, 396–97 (4th Cir.
2006).  Each of the press releases referenced by Lead Plaintiff stated that
"more information about risk factors, uncertainties, and other potential
factors that could affect the company's business and financial results is
included in its filings with the [SEC], including, without limitation . . .
the 10-K." (Defs.' Mem. in Supp., Exs. 10, 11, 12.)  Therefore, the Court
will also consider the 10-K in deciding this motion.

"seriously prejudiced Neustar's competitive standing."  (Am.

Compl. ¶ 16.)  Specifically, Defendants knew or recklessly

disregarded that

> Neustar's pricing reflected its monopolistic
> and incumbent position, that it was possible
> for the LNPA to earn a reasonable profit at
> significantly lower prices, and that the
> extension of the submission deadline
> permitted Telcordia or other potential
> competitors to structure a bid that was
> priced significantly lower than Neustar's
> proposal.

(*Id.* ¶ 51.)  However, Defendants filed a letter on the FCC's

public docket expressing their concerns about the RFP extension

and disclosed that letter in the May earnings call.  There is no

reason to believe that despite the deadline extension, Neustar

would not still remain confident in its position.  Furthermore,

an expression of confidence is best characterized as an opinion.

"In order to plead that an opinion is a false factual statement

under [*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083

(1991)], the complaint must allege that the opinion expressed

was different from the opinion actually held by the speaker."

*Nolte*, 390 F.3d at 315.  There is nothing in the complaint to

suggest that Defendants subjectively believed the April/May 2013

statements of confidence were false.

Second, Lead Plaintiff alleges that Neustar submitted

the October BAFO because it knew that it had been underbid by

Telcordia's September BAFO and that statements about its

22

confidence in its proposal ("We have continued to position ourselves for a successful NPAC renewal" and "[w]e continue to believe that our capabilities and outstanding track record set us apart from other bidders for the next NPAC contract") were therefore false.  (Am. Compl. ¶¶ 122, 123.)  In support of this position, they point only to Neustar's submittal of the bid and circumstantial evidence that later came to light about Telcordia's pricing.[7]  Again, these statements of confidence are best characterized as opinions.  As before, there is not enough information in the complaint to draw the inference that Defendants subjectively believed the statements were false when they were made.  Therefore, the statements qualify for protection under the PSLRA's safe harbor.

Turning next to the bespeaks caution doctrine, it appears that this doctrine has been applied, but not specifically adopted, in the Fourth Circuit.  *See Gasner v. Bd. of Supervisors of the Cnty. of Dinwiddie, Va.*, 103 F.3d 351, 362 (4th Cir. 1996) (Murnaghan, J. dissenting) (stating that majority erroneously applied the bespeaks caution doctrine and canvassing case law); *see also Cohen v. USEC Inc.*, 70 F. App'x 679, 686 (4th Cir. 2003) (affirming case on grounds other than bespeaks caution).  However, other district courts in this

---

[7] This is insufficient to demonstrate the statements were false.  *See* Section III.A.3, *infra*, regarding scienter.

circuit have applied the doctrine, and this Court will do so here.  "Under the so-called 'bespeaks caution' doctrine, claims of securities fraud are therefore subject to dismissal if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions."  *In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 823 (D. Md. 2002) (quoting *Gasner*, 103 F.3d at 358), *aff'd on other grounds*, *Cohen*, 70 F. App'x at 688; *see also Plymouth Cnty. Retirement Ass'n*, 966 F. Supp. 2d at 548 ("However, dismissals based on the bespeaks caution doctrine are appropriate when the complaint attempts to turn economic forecasts or corporate goals into actionable misrepresentations.") (citations and internal quotation marks omitted).

    As noted earlier, there was sufficient cautionary language to warn investors of the risks Neustar faced, specifically the non-renewal of the NAPM contract.  Therefore, these statements are not actionable under the bespeaks caution doctrine as well.  *See In re USEC*, 190 F. Supp. 2d at 823 (stating the prospectus was replete with cautionary language, including "There are a number of risks associated with the development and commercialization of [defendant's technology], ... and any of these could have a material adverse effect on the Company's financial or competitive position.").

24

In sum, even if Lead Plaintiff could identify a cognizable risk that has materialized as a result of Defendants' statements, thereby satisfying the element of loss causation, Lead Plaintiff's claims must still fail because the statements at issue are both puffery and forward-looking under the PSLRA and the bespeaks caution doctrine.

### 3. Scienter

Lead Plaintiff has also failed to make the requisite showing of scienter.  In order to satisfy the scienter requirement, the plaintiff must establish that defendants made the false or misleading statements with an "intention to deceive, manipulate, or defraud." *Oklahoma Firefighters Pension & Retirement Sys. v. K12, Inc.*, No. 1:14-CV-108 AJT/JFA, 2014 WL 5780936, at *2 (E.D. Va. Nov. 5, 2014) (quoting T*ellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (citation omitted)).  A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1); *see Tellabs*, 551 U.S. at 313-14.

In order to satisfy that requirement, a plaintiff must allege in its complaint facts that show that a defendant had actual knowledge that a forward-looking statement was false at the time it was made. See 15 U.S.C. § 78u-5(c)(1)(B); *In re CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 659 (D. Md. 2000).

The "actual knowledge" requirement may be satisfied by a showing of "recklessness." *Matrix Capital*, 576 F.3d at 181 ("Pleading recklessness is sufficient to satisfy the scienter requirement."). A "reckless" act is defined as an act that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003) (citation and internal quotation marks omitted).

Overall, in order to satisfy the scienter requirement, the alleged facts must raise a "strong inference" that the required level of scienter accompanying the alleged material misrepresentation is "at least as likely as any plausible opposing inference." *Matrix Capital*, 576 F.3d at 181 (quoting *Tellabs*, 551 U.S. at 322-24). "[T]he reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 181. Moreover, "corporate liability derives from the actions of its agents." *Id.* at 182 (citation and internal quotation marks omitted). If a plaintiff alleges corporate fraud, the plaintiff "must allege facts that support a strong inference of scienter

26

with respect to at least one authorized agent of the corporation." *Id.* To the extent a plaintiff alleges fraud claims against individual defendants, the plaintiff must allege facts supporting a strong inference of scienter as to each defendant. *Id.* (citations and internal quotation marks omitted).

Here, Lead Plaintiff has not pled facts showing that any defendant, corporate or otherwise, acted with actual knowledge that the statements were false or had a reckless disregard for the truth in making the statements. As stated earlier, Lead Plaintiff points to the April RFP deadline extension by the FCC and the October BAFO as circumstantial evidence of scienter. As to the RFP extension, as noted earlier Neustar is allowed to remain optimistic about its business prospects. There is nothing to show that at the time the deadline was extended, Neustar or any of its corporate officers subjectively believed that they were not confident in their ability to win contract renewal.

The October BAFO presents a closer question. From Lead Plaintiff's version of events, the only reason that Neustar submitted a second BAFO is because they knew that Telcordia submitted a lower bid and Neustar's statements of confidence belied its fear that it would lose the contract. Several assumptions underlie this theory. First, such an allegation

27

means that a source leaked confidential information to Neustar
in violation of the RFP process and applicable rules and
regulations.  This is possible, but it is speculative.  Lead
Plaintiff points to March reports in the *Capitol Forum*[8] to
suggest that there was, in fact, such a leak.  (Am. Compl. ¶¶
64, 65.)  However, the *Capitol Forum* reports were published in
March, well after the brief window in September and October in
which Neustar would have had to learn of the confidential bid
and then prepare a lower bid.

Second, to reach such a conclusion, Lead Plaintiff
would have the Court rely on anonymous sources cited in the
*Capitol Forum* as stating the October BAFO came in "just under
Telcordia's bid." (Am. Compl. ¶ 66.)  The Court cannot credit
such reports.  "To the extent that a newspaper article
corroborates plaintiff's own investigation and provides detailed
factual allegations, it can — at least in combination with
plaintiff's investigative efforts — be a reasonable source of
information and belief allegations." *In re McKesson HBOC, Inc.
Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000).  Such
newspaper articles should only be credited if they are

---

[8] According to Lead Plaintiff, the *Capitol Forum* is "a highly regarded
subscription news service that provides comprehensive news coverage of
competition policy as well as in-depth market and political analysis of
specific transactions and investigations." (Am. Compl. ¶ 64 n.3.)  The
*Capitol Forum* had approximately 500 subscribers in March 2014, though the
number of readers was probably less as subscribers could designate multiple
individuals to receive the report. (*Id.*)

28

"sufficiently particular and detailed to indicate their reliability." *Id.*  Here, Lead Plaintiff points to allegations in the amended complaint as corroborating the *Capitol Forum* report.  (Pl.'s Opp. at 11.)  Yet the Amended Complaint appears to incorporate the allegations from the *Capitol Forum*, without any evidence that Lead Plaintiff has taken an independent investigation of its own.  (*Compare* Pl.'s Opp. at 11 *with* Am. Compl. ¶ 68.)  Put differently, it appears Lead Plaintiff used the *Capitol Forum* reports to detail its allegations in the Amended Complaint and then holds out the Amended Complaint as corroboration for the allegations.  Such circularity does not qualify as corroboration.

        Furthermore, the Court is not satisfied that the *Capitol Forum* possess sufficient indicia of reliability, even if it could be construed as corroborating Lead Plaintiff's version of events.  *See Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) ("While we must accept plaintiffs' factual allegations as true, the Supreme Court in *Tellabs* held that we should not decide the issue of scienter by viewing individual allegations in isolation. Rather, we must examine the facts as a whole[.]") (citation omitted).  The Court knows nothing about the *Capitol Forum* beyond what Lead Plaintiff represents and has no way to assess the credibility of anonymous sources quoted in the article, whether the sources have personal

knowledge of the events described, and whether the sources were in a position to learn of such events personally. *See In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 573 (W.D. Va. 2006) ("A confidential witness' testimony can be used in pleading under the PSLRA so long as the testimony involves facts of which the witness had personal knowledge. Because the confidential witness must have personal knowledge, the testimony cannot be based on hearsay . . . Also, the plaintiffs must sufficiently allege that the confidential witness was in a position to know the facts related.")   Therefore, it is inappropriate for the Court to give substantial credit to the anonymous sources in the *Capitol Forum*. *See In re McKesson HBOC, Inc.*, 126 F. Supp. 2d at 1272 ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel.").

Finally, Lead Plaintiff's position also assumes that Neustar knew that price would ultimately be the determinative factor in awarding the contract. This is not necessarily the case. As Defendants note, the RFP stated "[t]echnical and [m]anagement criteria when combined are significantly more important than the cost criterion alone." (Defs.' Mem. in Supp. at 3; Am. Compl. ¶ 68.) The RFP also stated that "[c]ost may become determinative" only "[i]f Respondents' [t]echnical and [m]anagement merits are not significantly disparate." (Defs.'

30

Mem. in Supp. at 3; Am. Compl. ¶ 68.)  Leaving aside that
Defendants ultimately will not select the contract, it is not
outside the realm of possibility that Defendants would make a
strategic, albeit misguided choice, to highlight their technical
and management capabilities as the incumbent at the expense of
cost.  An equally plausible inference arising from Neustar's
actions surrounding the October BAFO is its desire to protect
its competitive advantage by submitting another proposal in what
was already an irregular RFP process.  Such an inference is more
compelling than the inference that Defendants acted with intent
to mislead or deceive.  *Cozzarelli*, 549 F.3d at 626.

Lead Plaintiff has not shown that any of the
Individual Defendants knew that the statements were false or
that they acted with recklessness.  As such, it cannot show that
Neustar acted with scienter.  Therefore, Lead Plaintiff has
failed to prove that any defendant acted with scienter.

**B.  Section 20(a) Control Person Claims**

Section 20(a) of the Exchange Act imposes liability on
each person[9] who "controls any person liable under any provision
of this chapter."  15 U.S.C. § 78t(a). Because the complaint
fails to withstand a Rule 12(b)(6) motion with respect to the
predicate violation of § 10(b), it also fails with respect to

---

[9] "The term 'person' means a natural person, company, government, or political
subdivision, agency, or instrumentality of a government." 15 U.S.C. § 78c(9).

31

the § 20(a) claims.  *Matrix*, 576 F.3d at 192.  Therefore, the

section 20(a) claims against Hook, Edwards, and Lalljie are also

dismissed.

## IV. Conclusion

For the foregoing reasons, the Court will grant

Defendants' motion to dismiss.  An appropriate order will issue.


| | |
|---|---|
| | /s/ |
| January 27, 2015 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |