IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division


)
)
IN RE NEUSTAR, INC. SECURITIES )
)      1:14cv885 (JCC/TRJ)
LITIGATION            )
)
)

**M E M O R A N D U M   O P I N I O N**

By order and memorandum opinion dated September 22,
2015, and September 23, 2015, respectively, this Court took the
following actions: (1) certified a settlement class, appointed
Class Representative, Class Counsel, and Claims Administrator;
(2) preliminarily approved the proposed Settlement Agreement;
and (3) approved the form and manner of notice.  (Sept. 22, 2015
Order [Dkt. 53]; Mem. Op. [Dkt. 54].)  On December 3, 2015, the
present matter came before the Court on Lead Plaintiff's
Unopposed Motion for Final Approval of Proposed Class Action
Settlement and Plan of Allocation [Dkt. 56], and Motion for
Attorneys' Fees and Expenses [Dkt. 58].  The Court approved
those motions by written orders on December 3, 2015.  This
memorandum opinion elaborates on the basis for those rulings.

**I.      Background**

The facts of this case are set out at length in this

1

Court's two prior memorandum opinions.  *See In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671 (E.D. Va. 2015) (motion to dismiss); *In re Neustar Inc. Sec. Litig.*, No. 1:14cv885 (JCC/TRJ), 2015 WL 5674798 (E.D. Va. Sept. 23, 2015) (preliminary settlement approval).  The facts are presumed known and discussed only to the extent necessary to aid the present motions.

This case involved allegations that Defendants NeuStar, Inc. ("NeuStar") and several NeuStar executives (collectively "Defendants") made fraudulent statements or omissions in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.  The statements or omissions related to NeuStar's competitiveness in the bidding process for a lucrative Federal Communications Commission ("FCC") contract that NeuStar previously administered.  Despite indications that NeuStar might lose the bidding, Defendants allegedly made public statements between April 18, 2013, and June 6, 2014, reassuring investors of the competitiveness of NeuStar's bid.  This legal proceeding began shortly after the FCC inadvertently disclosed that NeuStar would not win the contract.

In July 2014, Lead Plaintiff's predecessor filed this federal securities class action on behalf of those who purchased

2

NeuStar's publicly traded common stock between April 19, 2013, and June 6, 2014. The Court appointed the Indiana Public Retirement Systems as Lead Plaintiff and approved selected counsel. Thereafter, the Court granted Defendants' motion to dismiss, finding that Defendants' statements were not actionable under the securities law, there was no loss causation, and Defendants did not act with the requisite scienter. *In re Neustar*, 83 F. Supp. 3d at 686. Lead Plaintiff timely noticed an appeal to the Fourth Circuit, but the parties reached an agreement in settlement before briefing their appellate arguments. The Fourth Circuit remanded the case to this Court to consider the proposed Settlement.

Lead Plaintiff then motioned for the unopposed preliminary approval of the proposed Settlement. The Court granted that motion after conducting a preliminary fairness hearing on September 17, 2015. Specifically, the Court certified a settlement-only class pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3); appointed Lead Plaintiff as Class Representative, Lead Counsel as Class Counsel, and A.B. Data as Claims Administrator; preliminarily approved the terms of Settlement according to Rule 23(e); and approved the form and manner of notice as required by the U.S. Constitution, Rule 23(c)(2), and the Private Securities Litigation Reform Act

3

("PSLRA"), 15 U.S.C. § 78u-4(a)(7).  The Court explained its order in a detailed memorandum opinion.  *In re Neustar*, No. 1:14cv885, 2015 WL 5674798 (E.D. Va. Sept. 23, 2015).

Pursuant to that order, Claim Administrator caused over 44,000 notice packets to be sent to potential class members.  (Walter Reply Decl. [Dkt. 64-1] ¶ 6.)  Claim Administrator also posted the court-approved notice on a website dedicated to this settlement, published notice in *Investor's Business Daily*, and broadcast the notice via *PR Newswire*.  (Walter Decl. [Dkt. 60-2].)  By the November 12, 2015 deadline for receiving objections, Claim Administrator received no requests for exclusion from the class and no substantial objection to the settlement.[1]

Plaintiff now moves for final approval of the terms of settlement, approval of the plan of allocation of the net settlement fund, and approval of attorneys' fees and expenses.  The Court held a final settlement hearing to consider these motions on December 3, 2015.  For the foregoing reasons, the

---

[1]   Claims Administrator received one hand-written objection consisting of thirty-seven words of generalized objection to the per-share recovery from settlement, the societal value of class action lawsuits, and the significance of this settlement in particular.  (*See* Objection [Dkt. 64-2].)  As discussed later in this memorandum opinion, this informal and insubstantial objection does not affect the Court's analysis of the settlement.

Court granted the motions.

## II.    Analysis

As the Court's prior memorandum opinion and order certified a settlement class,[2] this memorandum opinion addresses the following three remaining issues: (1) the proposed Settlement between the parties; (2) the proposed allocation thereof; and (3) the award of attorneys' fees and cost to Class Counsel.  The Court will address each issue in turn.

A.        **Terms of Proposed Settlement**

Before parties may settle a class action, a court must

---

[2]    The Class consists of the following:

> All persons who purchased or otherwise acquired the publicly traded common stock of Neustar, Inc. between April 19, 2013 and June 6, 2014, inclusive, and who were damaged thereby.  Excluded from the Settlement Class are: (i) Defendants; (ii) present and former executive officers of Neustar; (iii) members of Neustar's Board of Directors; (iv) Immediate Family Members of any of the foregoing individuals; (v) the legal representatives, heirs, successors or assigns of any of the foregoing individuals and entitles; (vi) any entity in which Defendants have or had a controlling interest; and (vii) any affiliate of Neustar.  Also excluded from the Settlement Class will be any Person who timely and validly seeks exclusion from the Settlement Class and is so excluded by the Court.

(Sept. 22, 2015 Order ¶ 2.)  No persons have timely or validly sought exclusion from this Class.

5

approve the settlement.  Fed. R. Civ. P. 23(e).  Final settlement requires a hearing to determine whether the agreement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2). This standard includes an assessment of both the procedural fairness of the settlement negotiations and the substantive adequacy of the agreement itself.  *See In re Am. Capital S'holder Derivative Litig.*, No. 11-2424 PJM, 2013 WL 3322294, at *3 (D. Md. June 28, 2013) (identifying procedural and substantive prongs of settlement analysis).  The procedural fairness inquiry protects against "the danger of counsel . . . compromising a suit for an inadequate amount for the sake of insuring a fee."  *Id.*  The substantive adequacy inquiry, by contrast, "weigh[s] the likelihood of the plaintiff's recovery on the merits against the amount offered in the settlement." *Id.*  (internal quotations omitted).  Together, these requirements serve to protect "class members whose rights may not have been given adequate consideration during the settlement negotiations."  *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

A court may apply these same principles in a preliminary fairness hearing, as the Court did in this case. When a district court preliminary approves a settlement after a hearing, the proposed settlement enjoys a presumption of

fairness.  *See Berkley v. United States*, 59 Fed. Cl. 675, 681

(Fed. Cl. 2004) ("Settlement proposals enjoy a presumption of

fairness afforded by a court's preliminary fairness

determination."); *In re Gen. Motors Corp. Pick-Up Truck Fuel

Tank Products Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)

("This preliminary determination establishes an initial

presumption of fairness . . . ."); *Martin v. Cargill, Inc.*, 295

F.R.D. 380, 383 (D. Minn. 2013) (accord); *In re Tableware

Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)

(accord).

        i)       *Fairness*

       The four *Jiffy Lube* factors guide the Court's analysis

of whether the settlement was fairly reached through good-faith

bargaining at arm's length.  *In re Jiffy Lube Sec. Litig.*, 927

F.2d 155 (4th Cir. 1991).  Those factors are "(1) the posture of

the case at the time settlement was proposed, (2) the extent of

discovery that had been conducted, (3) the circumstances

surrounding the negotiations, and (4) the experience of counsel

in the area of securities class actions litigation."  *Id.* at

159.  The proposed Settlement satisfies these factors.

       Considering the posture of the case at the time of

settlement allows the Court to determine whether the case has

progressed far enough to dispel any wariness of "possible

collusion among the settling parties." *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 254 (E.D. Va. 2009) (quoting *In re Jiffy Lube*, 927 F.2d at 159).  In this case, as in *In re MicroStrategy, Inc.*, although the "settlement was reached relatively early in the litigation, it was reached only after the Settling Parties vigorously contested a motion to dismiss." 148 F. Supp. 2d 654, 664 (E.D. Va. 2001).  Unsatisfied with the Court's dismissal of this case, Lead Plaintiff noticed an appeal before reaching a settlement with Defendants.  As this Court noted at the preliminary approval stage, "[t]hese adversarial encounters dispel any apprehension of collusion between the parties."  *In re NeuStar*, 2015 WL 5674798, at *10.

The second *Jiffy Lube* factor—the extent of discovery— ensures that all parties "appreciate the full landscape of their case when agreeing to enter into the Settlement."  *The Mills Corp.*, 265 F.R.D. at 254.  This factor derives from the recognition that "a reasonable judgment of the possible merits of the case is best achieved when all discovery has been completed and the case is ready for trial."  *In re Jiffy Lube*, 927 F.2d at 159.  Although this case never reached fact or class discovery proceedings, the Court is satisfied that two years of litigation and investigation have fully informed Class Counsel of the value of its claims against Defendants.  According to

Class Counsel, it conducted a "rigorous investigation" of the claims before filing an amended complaint, including: review of NeuStar's SEC filings and public statements, analysis of the entire FCC public record concerning the contract bidding and selection process, investigation of all available media reports concerning the bidding, communications with staff from subscription news service *The Capitol Forum*, interviews with twenty-one former NeuStar employees, and consultation with a damages and causation expert.  (Goldsmith Decl. [Dkt. 60] ¶ 54.) Thus, "although this settlement came early on—prior to the completion of formal discovery-it is clear that plaintiffs have conducted sufficient informal discovery and investigation to . . . evaluate [fairly] the merits of Defendants' positions during settlement negotiations."  *In re MicroStrategy*, 148 F. Supp. 2d at 664 (internal quotation and citation omitted).

        The negotiations leading to settlement were also sufficient to satisfy the third *Jiffy Lube* factor.  This factor requires the Court to consider "the negotiation process by which the settlement was reached in order to ensure that the compromise [is] the result of arm's-length negotiations . . . necessary to effective representation of the class's interests."  *The Mills Corp.*, 265 F.R.D. at 255 (internal quotation and citations omitted).  This Settlement is the

product of an informed negotiation before a mediation neutral. The parties initially appeared before a Senior Resident Circuit Mediator for the Fourth Circuit. (Goldsmith Decl. ¶ 44.)  After two appearances before this Mediator, the parties engaged a private neutral affiliated with Judicial Arbitration and Mediation Services. (*Id.* ¶ 45.)  Class Counsel, an authorized representative of Lead Plaintiff, Defendants' Counsel, authorized representatives of NeuStar, and counsel for Defendants' insurance carriers then attended a day-long mediation with the private neutral. (*Id.* ¶ 46.)  Class Counsel came equipped with the facts acquired through its informal discovery, as well as new information of the FCC's contract-award decision and a reevaluated perspective of the strength of its case after this Court's dismissal. (*Id.* ¶ 56.) Additionally, both parties submitted detailed mediation briefs describing the relative strengths of their positions. (*Id.*) Class Counsel supplemented its mediation brief with a "robust and sophisticated market efficiency, loss causation and damages analysis prepared by Lead Plaintiff's expert." (*Id.*)  These negotiations were sufficiently informed, thorough, and at arm's length to conclude that the parties fairly arrived at the proposed Settlement.

Lastly, the Court is satisfied that Class Counsel is

sufficiently experienced in the field of securities fraud class action litigation to fairly represent the interests of the Class.  The Court may pay heed to Class Counsel's judgment in approving, negotiating, and entering into a putative settlement when counsel are "nationally recognized members of the securities litigation bar," as is the case here.  *The Mills Corp.*, 265 F.R.D. at 255.  This Court has already found Class Counsel to be "sufficiently qualified and experienced to fairly represent the interests of the class."  *In re NeuStar*, 2015 WL 5674798, at *5.  Class Counsel's experience in the field of securities fraud class actions generally and management of this case in particular reaffirms the Court's prior assessment. Class Counsel's firm resume includes five pages of notable securities class action successes demonstrating counsel's competency.  (Firm Resume [Dkt. 60-5] Ex. C at 2-7.)  Guided by this experience and success, Class Counsel represents the Settlement to be fair, reasonable, and adequate.  Furthermore, Lead Plaintiff is a sophisticated institutional investor that also approves of the Settlement.  (Goldsmith Decl. ¶ 50.)  The Court finds from the foregoing factors that the integrity of the arm's length negotiation process was preserved, indicating that this settlement is sufficiently "fair" under Federal Rule of Civil Procedure 23.

            *ii)*       *Adequacy*

The Court is also satisfied that the $2,625,000 gross recovery for the Class and other terms of Settlement are adequate.  The adequacy analysis "weigh[s] the likelihood of the plaintiff's recovery on the merits against the amount offered in settlement."  *In re Am. Capital*, 2013 WL 3322294, at *3.  The factors to consider include:

> (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

*In re Jiffy Lube*, 927 F.2d at 159.

The Court previously discussed the first four factors in its preliminary fairness analysis.  The substance of those factors has not changed since that time and the Court incorporates the preliminary fairness memorandum opinion here.  In brief, substantial legal and financial obstacles stand between Lead Plaintiff and any recovery on the merits of its claims.  In light of those obstacles, the gross Settlement amount of $2,625,000 is a substantial victory for the Class and weighs heavily on the side of finding the agreement adequate.

The lack of opposition to the Settlement amount

further supports a finding of adequacy.  The court-appointed
Claims Administrator distributed more than 44,000 packets
notifying potential Class members of the Settlement amount and
terms.  Additionally, the notices informed interested parties
how to object to the Settlement.  After notice through the
thousands of packets, print publications, and broadcasts, only
one objection was received.  The handwritten objection consisted
of thirty-seven words of general discontent with the size of the
settlement and the societal value of class action settlements
generally.[3]  As the objection contains no indication that the
objector is a class member and is devoid of actual argument, the
Court gives the objection no weight at all.  Therefore, all
parties, the unanimity of potential Class members, and this
Court agree the Settlement is sufficiently adequate.

       In conclusion, the Court finds the proposed Settlement
is fair, reasonable, and adequate under Federal Rule of Civil
Procedure 23.  Accordingly, the Court approves the proposed
Settlement.  The Court will now consider the proposed plan of
allocation.

---

[3]     The objection reads as follows: "$.06 per share for
settlement?  Really?!?  Don't you have something better to do
with your time?  Find something to do that benefits society.  By
the way, the settlement is barely minor league.  You should be
ashamed."  (*See* Objection [Dkt. 64-2].)

13

B.          **Plan of Allocation**

The plan of allocation, like the Settlement itself, must meet the standards of fairness, adequacy, and reasonableness.  *See In re MicroStrategy*, 148 F. Supp. 2d at 668 ("To warrant approval, the plan of allocation must also meet the standards by which the partial settlement was scrutinized— namely, it must be fair and adequate.").  When evaluating the plan, "the opinion of qualified counsel is entitled to significant respect."  *The Mills Corp.*, 265 F.R.D. at 258.  "The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis."  *Id.*

Here, Class Counsel received expert advice from a Virginia Corporation, Nathan Associates, Inc., to create the plan of allocation.  (Counsel Decl. [Dkt. 60] ¶¶ 65-67.)  As a general matter, the plan treats class members fairly by awarding a pro rata share to every claimant.  However, the plan also accounts for the fact that not every class member suffered identical losses attributable to Defendants' actions.  Specifically, the plan identifies three dates corresponding with Defendants' actions that likely affected the amount of artificial inflation in NeuStar share prices at the time of

14

purchase.  Specifically, Lead Plaintiff believes that the merits

of the claims against Defendants became stronger on October 30,

2013,[4] because this was the "first date on which Defendants made

allegedly false and misleading statements after Neustar

submitted an unsolicited, revised best-and-final offer for the

NPAC contracts that was subsequently rejected."  (Notice [Dkt.

60-2] Ex. A at 7.)  Therefore, purchasers after this date are

allocated more on a per-share basis.  Additionally, Lead

Plaintiff believes that Defendants made corrective statements on

January 30, 2014, and June 9, 2014, which "impacted the market

price of publicly traded Neustar common stock and removed the

alleged artificial inflation from the stock price."  (*Id.*)

Therefore, these two dates also serve as points of

differentiation in the plan of allocation.  In light of those

identified events and dates, Class Counsel and its expert

propose the following three-group plan of allocation.

---

[4]   The Notice of the Plan of Allocation and the Memorandum in
Support of Approval of the Plan of Allocation both stated that
"Lead Plaintiff believes that the merits of the claims became
stronger as of October 30, 2014, the first date on which
Defendants made allegedly false and misleading statements after
Neustar submitted the October Revised BAFO."  (Mem in Supp. at
19; Notice Ex. A at 7.).  The reference to October 2014 appears
to be an error.  The correct date should be October 2013.  The
amended complaint states that Neustar submitted its revised
offer in October 2013.  (Am. Compl. [Dkt. 23] at ¶¶ 63-67.)
Additionally, the Plan of Allocation groups claimants based on
whether they purchased before or after October 30, 2013.
(Notice Ex. A at 7.)

The first group consists of claimants who purchased stock between April 19, 2013, and October 29, 2013.  These purchasers acquired shares before the Defendants' statements regarding the revised best-and-final offer.  The allocation for these claimants is based on the date they sold their stock, as follows:

> (1) Sold on or before January 29, 2014, the Recognized Loss per share is zero.  (2) Sold between January 30, 2014, and June 6, 2014, inclusive, the Recognized Loss per share is the <u>lesser</u> of (a) the excess of the purchase price over the sale price or (b) $8.58.  (3) Held as of the close of trading on June 6, 2014, the Recognized Loss per share is $8.58.

(*Id.*)

The second group consists of individuals who purchased stock after the October 30, 2013 statements but before the corrective statements of January 29, 2014.  The allocation for these claimants is based on the date they sold their stock, as follows:

> (1) Sold on or before January 29, 2014, the Recognized Loss per share is zero.  (2) Sold between January 30, 2014, and June 6, 2014, inclusive, the Recognized Loss per share is the <u>lesser</u> of (a) the excess of the purchase price over the sale price or (b) $9.15.  (3) Held as of the close of trading on June 6, 2014, the Recognized Loss per share is $9.15.

(*Id.*)

16

Lastly, the third group consists of Class members who purchased shares after the first corrective statement on January 30, 2014, but before the last corrective statement on June 6, 2014.  These third-group members receive less allocation because they purchased after the alleged fraudulent statements were partially corrected and thus the price inflation was decreased. These purchasers are allocated nothing if they sold before June 6, 2014.  They will receive the lesser of the excess of the purchase price over $27.28 or $2.27, if they continued to hold stock as of the close of trading on June 6, 2014.  (*Id.*)

Thus, the planned allocation "fairly treats class members by awarding a pro rata share to every Authorized Claimant, but also sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of the class members' individual claims and the timing of purchases of the securities at issue."  *In re MicroStrategy*, 148 F. Supp. 2d at 669.  Accordingly, the Court finds the plan to be a fair, reasonable, and adequate allocation of settlement proceeds and approves the plan of allocation.

## C.        __Attorneys' Fees and Expenses__

Having approved the Settlement and proposed plan of allocation, the only issue remaining is Class Counsel's motion for $498,750 in attorneys' fees and $119,507.44 in costs.  The

17

PSLRA provides for an award of attorneys' fees and costs out of any recovery obtained by plaintiffs in a securities fraud class action. *See* 15 U.S.C. § 78u-4(a)(6). But, the PSLRA limits an award of fees and expenses to "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." *Id.* Thus, a court has "an independent obligation to ensure the reasonableness of any fee request." *In re MicroStrategy*, 172 F. Supp. 2d at 786 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 281-82 (3d Cir. 2001)).

The PSLRA does not create a specific method for calculating fees and costs. *MicroStrategy*, 172 F. Supp. 2d at 786. Instead, courts may exercise their discretion to set an award of attorneys' fees and costs at a reasonable amount. *The Mills Corp.*, 265 F.R.D. at 252. Courts evaluating PSLRA fees typically employ the percentage-of-recovery method or the lodestar method of calculation. Under the percentage-of-recovery method, the award is based on a reasonable percentage of the common fund recovered for the Class. The lodestar method, by contrast, "requires the multiplication of the number of hours worked by a reasonable hourly rate, the product of which the Court can then adjust by employing a 'multiplier.'" *Id.* at 260.

18

In this case, the parties proposed a fee based on Class Counsel's prior negotiation of a fee arrangement with Lead Plaintiff which is reasonable under both methods.  Therefore, the Court will adopt the common practice within this Circuit; the Court will apply the percentage-of-recovery method and then use the lodestar method as a "cross-check."  *See id.* (applying percentage method with lodestar cross-check); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 385 (D. Md. 2006) ("While the Fourth Circuit has not yet definitively addressed the issue, other district judges in this circuit have suggested a flexible analysis that uses the percentage of recovery method but applies the lodestar method as a cross-check . . . .").

      i)        *Percentage of Recovery Test*

When evaluating Class Counsel's fee request under the percentage-of-recovery method, the Court will apply the seven-factor approach that other district courts in this Circuit have adapted from the Third Circuit case of *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000).  *See, e.g.*, *In re Wachovia Corp. ERISA Litig.*, No. 3:09cv262, 2011 WL 5037183, at *3 (W.D.N.C. Oct. 24, 2011) (applying these factors); *The Mills Corp.*, 265 F.R.D. at 261 (same).  Those factors include the following: (1) the results obtained for the Class; (2) the presence or absence of substantial objections by members of the

19

class; (3) the quality and skill of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) public policy considerations; and (7) awards in similar cases. *Gunter*, 223 F.3d at 195 n.1.

> a.   *Results Obtained for the Class*

The result achieved is among the most important factors to be considered in making a fee award. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("[T]he most critical factor is the degree of success obtained."). In this case, Class Counsel's efforts have led to the creation of a $2,650,000 common fund to be distributed to class members on a modified pro rata basis. Although this amount is modest relative to "megafund" cases, it is nevertheless a substantial value for class member in this particular case. The millions in the common fund are far more than class members were likely to recover through continued litigation on the merits. *See In re Wachovia*, 2011 WL 5037183, at *4 (accounting for dismissal on the merits and unlikelihood of success on appeal or remand). To receive any benefit through continued litigation, Class Counsel had to succeed on its appeal to the Fourth Circuit, certify a class, survive summary judgment, and ultimately persuade a jury to award a money judgment. Class Counsel acknowledges that the probability of passing the first step—succeeding on appeal—was

20

very low.  (*See* Mem. in Supp. [Dkt. 59] at 6 (calling risk of
affirmance "substantial").)  Indeed, this Court found several
dispositive shortcomings in Lead Plaintiff's case at the motion-
to-dismiss stage.  *See In re NeuStar*, 83 F. Supp. 3d at 679-86;
*In re NeuStar*, 2015 WL 5674798, at *11 ("Any one of these
deficiencies would have been sufficient for the Court to dismiss
the complaint.").  In light of the substantial probability of
receiving no recovery on the merits, the settlement amount of
$2,625,000 represents a fair result for the Class.  The absence
of substantial objections to the settlement amount also
demonstrates that the result achieved is a desirable one.

### b.   Objections

Additionally, there have been no objections to the
attorneys' fees or costs requested in this case.  As of November
24, 2015, the claims processor had mailed over 44,000 notice
packets to potential Class members.  (Decl. of A. Walter [Dkt.
64-1] ¶ 6.)  The notice disclosed the settlement amount and that
Class Counsel would seek a fee award of no more than 19% and
litigation expenses not to exceed $200,000.  As discussed above,
Claims Administrator received no objection to attorneys' fees or
requested expenses.  The lack of objection is particularly
informative of fairness in this case because Class Counsel is
seeking less in fees and expenses than was disclosed in the

notice.  Thus, the lack of objections supports finding the fee request reasonable.  *See The Mills Corp.*, 265 F.R.D. at 262 ("Thus, while not dispositive, the death of legitimate objections to the requested fee of 18% enforces the reasonableness of that request in the Court's eyes.").

    *c.  Quality and Skill of Attorneys Involved*

    The Court has found Class Counsel to have "an extensive record of representing plaintiffs in securities class actions" and to have advocated "vigorously" throughout this litigation.  *In re NeuStar*, 2015 WL 5674798, at *5.  Class Counsel conducted substantial informal fact discovery when structuring this lawsuit, including reviewing all relevant SEC filings, the entire FCC public record concerning the contract bidding process, and all available media reports.  (Mem. in Supp. at 5.)  Additionally, Class Counsel consulted with a damages and causation expert throughout litigation and settlement discussions.  (*Id.* at 5-6.)  Although ultimately unsuccessful on the merits, Class Counsel litigated this case skillfully and efficiently.  Even after suffering a dismissal of the case, Class Counsel advocated for the Class by filing an appeal and presenting comprehensive mediation statements to a private mediator.  (*Id.* at 7.)  Throughout these proceedings, Class Counsel proceeded against experienced and sophisticated

defense counsel with a nationally recognized complex litigation
practice.  *See The Mills Corp.*, 265 F.R.D. at 262 (noting
defense counsel's skill as a consideration).  Class Counsel's
skill and quality permitted it to achieve this fair and
reasonable result for the class, despite the substantial
adversarial and legal barriers it faced in this suit.

> d.    *Complexity and Duration of the*
>       *Litigation*

Securities fraud class actions are complex and
difficult to prosecute, as "[e]lements such as scienter,
reliance, and materiality of representation are notoriously
difficult to establish."  *See id.* at 263.  The Court's dismissal
demonstrates the difficulty of proving those elements in this
case, as the Court found no indication of scienter, loss
causation, or materiality.  Hence, this case presented many
factual and legal difficulties for Class Counsel.  Perhaps in
light of those difficulties, this case quickly proceeded from
the initial complaint to settlement.  Class Counsel motioned for
approval of its agreement in principle less than thirteen months
after filing the complaint and before any formal discovery or
appellate briefing.  And although the Court finds that this
settlement is both adequate and was fairly reached, the
agreement in principal came after only one day of mediation.
Thus, this case presented difficult factual and legal problems

for counsel, but proceeded through the stages of litigation at a rapid pace.  *See In re Wachovia*, 2011 WL 5037183, at *4 (noting substantive complexity but lack of prolonged litigation).

> e.   *Risk of Nonpayment*

The risk of nonpayment in this case does not come from Defendant's financial condition, but from the uncertainty that Lead Plaintiff would prevail on the merits.  Class Counsel undertook the case on a contingent-fee basis, which created a "substantial risk of nonpayment."  *The Mills Corp.*, 265 F.R.D. at 263; *MicroStrategy*, 172 F. Supp. 2d at 788 (noting risk of nonpayment in securities fraud class action contingency cases). The potential for nonpayment became even more apparent after the Court dismissed Lead Plaintiff's amended complaint.  Despite this risk of nonpayment, Class Counsel worked nearly 2,100 hours and advanced or incurred almost $120,000 in expenses during the course of litigation and settlement to secure a favorable result for the Class.  (*See* Decl. Exs. 5-A, 6-A, 5-B, 6-B and 7.) Thus, beyond mere risk of nonpayment, Class Counsel stood to lose substantial sunk costs if this case ended with an unfavorable judgment on the merits.

> f.   *Public Policy Considerations*

When determining a proper fee percentage, the Court considers two countervailing public policies.  *See In re*

*Wachovia*, 2011 WL 5037183, at *5.  On the one hand, the Court is concerned with the "need to diminish the perception among a significant part of the non-lawyer population and even among lawyers and judges that the risk premium is too high in class action cases and that class action plaintiffs' lawyers are overcompensated for the work that they do." *Id.* (quoting *Third Circuit Task Force Report, Selection of Class Counsel*, 208 F.R.D. 340, 343-44 (Jan. 15, 2002)).  On the other hand, a PSLRA fee "must include an incentive component to ensure that competent, experienced counsel will be encouraged to undertake the often risky and arduous task of representing a class in a securities fraud case." *In re MicroStrategy*, 172 F. Supp. 2d at 788.

After considering the foregoing factors and policies, the Court finds that attorneys' fees equal to 19% of the Settlement fund is a reasonable award in this case.  The Court finds this fee sufficient to incentivize qualified counsel to expend the significant resources necessary to effectively litigate meritorious cases.  At the same time, this percentage is on the lower end of awards in similar cases, as indicated below.

g.   *Awards in Similar Cases*

Comparing the size of fund and fee awards in other cases, while overly simplistic, "nonetheless provides a valuable point of reference."  *The Mills Corp.*, 265 F.R.D. at 264.  A comparison of recent cases with analogous settlement values within this Circuit indicates that 19% is below the typical range of fee awards in similar securities class actions and common fund cases.  *See Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 465 (D. Md. 2014) ("Cases in this circuit involving settlement comparable to the $3.6 million settlement fund here have resulted in awards of attorneys' fees in the ranges of 25% to 28% of the common fund.")

| *Case* | *Approximate Size of Fund/Recovery* | *Percentage Award* |
|---|---|---|
| *Braun v. Culp, Inc.*, 1985 WL 5857 (M.D.N.C. 1985) | $1,500,000 | 25% |
| *Strang v. JHM Mortg. Sec. Ltd.*, 890 F. Supp. 499 (E.D. Va. 1995) | $1,150,000 | 25% |
| *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665 (D. Md. 2013) | $2,500,000 | 25% |
| *In re SPX Corp. ERISA Litig.*, 2007 U.S. Dist. LEXIS 28072 (W.D.N.C. Apr. 13, 2007) | $3,600,000 | 28% |
| *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451 (D. Md. 2014) | $3,600,000 | 28% |
| *In re LandAmerica 1031 Exch. Servs., Inc.*, 2012 WL 5430841 (D.S.C. Nov. 7, 2012) | $4,000,000 | 25% |
| *Smith v. Krispy Kreme Doughnut Corp.*, 2007 WL 119157 (M.D.N.C. Jan. 10, 2007) | $4,750,000 | 26% |

Class Counsel's request of 19% falls below the range of fees awarded in those comparable cases.  This provides a strong indication of the reasonableness of the fee requested.

  *ii)*   *Lodestar Cross-Check*

A lodestar cross-check of the 19% fee request confirms the fairness and reasonableness of the fee.  To apply the lodestar method, "a court must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate."  *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009).  To determine what rates and hours are "reasonable," a court applies a twelve-factor tests to guide its discretion.  *See Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978).[5]  The court then substracts fees for hours spent on unsuccessful claims unrelated to successful ones.  *Robinson*, 560 F.3d at 244.  "Because the lodestar is employed as a 'cross-check' and because these factors are so

---

[5] The twelve factors are as follows: (1) time and labor expanded; (2) novelty and difficulty of the questions raised; (3) skill required to properly perform the legal services; (4) opportunity costs in pursuing the instant litigation; (5) customary fee for like work; (6) attorney's expectation at the outset of litigation; (7) time limitations imposed by the client or circumstances; (8) amount in controversy and results obtained; (9) attorney credentials; (10) undesirability of the case within the legal community in which it arose; (11) nature and length of the professional relationship between attorney and client; and (12) fee awards in similar cases.  *See Barber*, 577 F.2d at 226 n.28.

similar to the seven factors analyzed within, each of the twelve *Barber* factors will not be laid out and analyzed separately." *The Mills Corp.*, 265 F.R.D. at 261 n.6.  "When using lodestar as a 'cross-check,' the Court need[] not apply the 'exhaustive scrutiny' typically mandated, and the Court may accept the hours estimates provided by Lead Counsel."  *The Mills Corp.*, 265 F.R.D. at 264.

Class Counsel expended roughly 2,100 hours on this case and charged rates of $260-310 for paralegal services, $420-700 for associates, and $800-975 for partners.  (Exs. 5-A, 6-A, 7 [Dkts. 60-5, 60-6, 60-7].)  These hours and billing rates combined to produce a lodestar of $1,380,671.  (Ex. 7 [Dkt. 60-7].)  The fee request of $498,750 represents a "multiplier" of 0.36.  Such a low multiplier is comfortably below the range of multipliers other courts have found to be reasonable.  *See Domonoske v. Bank of Am., N.A.*, 790 F. Supp. 2d 466, 476 (W.D. Va. 2011) (surveying cases to conclude that a 1.8 multiplier is "well within the normal range of lodestar multipliers").

Although the hourly rates charged here are well above those set forth in the Laffey Matrix,[6] the fee request would

---

[6]   "The Laffey Matrix is used as a guideline for reasonable attorneys' fees in the Washington/Baltimore area."  *Galvez v. Am. Servs. Corp.*, No. 1:11cv1351 (JCC/TCB), 2012 WL 2522814, at *5 n.6 (E.D. Va. June 29, 2012).

remain reasonable if the Court were to discount the total lodestar figure by fifty percent.  At that discount, the lodestar would be around $700,000.  Thus, the lodestar still be greater than the fees Class Counsel requested.

Having considered the factors discussed above in light of the totality of the circumstances, the Court finds the fee award of 19% of the Settlement is fair and reasonable compensation for Class Counsel.  Skilled counsel committed substantial resources to achieve a fair result for the class, despite the legal and factual difficulties that this case presented.  Furthermore, the fees fall below those commonly awarded in similar cases and prompted no objection from class members.  A lodestar cross-check confirms that this award appropriately balances competing public policies by fairly compensating counsel.  Therefore, the Court approves the $498,750 requested in attorneys' fees.

### iii)    Costs

In addition to the fees awarded above, Class Counsel seeks reimbursement of $119,507.44 for litigation expenses incurred in connection with the prosecution and settlement of this action.  "There is no doubt that costs, if reasonable in nature and amount, may appropriately be reimbursed from the common fund."  *In re MicroStrategy*, 172 F. Supp. 2d at 791.

Class Counsel's claimed costs include expert fees, computer research fees, transportation expenses, mediation fees, and various expenses for document printing, filing, and delivery. (Exs. 5-B, 6-B [Dkts. 60-5, 60-6].)  The bulk of these expenses arise from almost $80,000 paid to Class Counsel's loss causation and damages expert, who opined on issues of market efficiency, loss causation, and damages during settlement mediation and negotiation and helped structure the plan of allocation.  (Mem. in Supp. at 13.)  The expenses appear to be reasonable, given the case's complexity, the time and effort required, and the fact that no class member objected to the notice disclosing a potential expense request of $200,000.  Accordingly, the request is granted.

### III.    Conclusion

For the foregoing reasons, the Court grants Lead Plaintiff's Unopposed Motion for Final Approval of the Proposed Settlement, Motion for Approval of Plan of Allocation, and Motion for Attorneys' Fees and Expenses.  Appropriate orders issued on December 3, 2015.

/s/

December 8 , 2015                      James C. Cacheris
Alexandria, Virginia         UNITED STATES DISTRICT COURT JUDGE